Lesley E. Weaver (SBN 191305)
*lweaver@bfalaw.com*
Anne K. Davis (SBN 267909)
*adavis@bfalaw.com*
Joshua D. Samra (SBN 313050)
*jsamra@bfalaw.com*
**BLEICHMAR FONTI & AULD LLP**
1330 Broadway, Suite 630
Oakland, California 94612
Tel.: (415) 445-4003
Fax: (415) 445-4020

*Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JERRY JONES, ARTURO GARCIA, and RONALD WEIS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA PHYSICIANS' SERVICE D/B/A BLUE SHIELD OF CALIFORNIA,<br><br>Defendant. | Case No. 3:25-cv-03743<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>1. **Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510,** *et seq.*<br>2. **Intrusion Upon Seclusion**<br>3. **Breach of Confidence**<br>4. **Violations of Cal. Penal Code §§ 631,** *et seq.*<br>5. **Violations of Cal. Penal Code § 638.51(a)**<br>6. **Violations of Cal. Civ. Code §§ 56,** *et seq.*<br>7. **Violations of Cal. Bus. & Prof. Code §§ 17200,** *et seq.*<br>8. **Violations of Cal. Const. Art. 1 § 1**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Jerry Jones, Arturo Garcia, and Ronald Weis (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class Members"), by and through their attorneys, bring this class action against Defendant California Physicians' Service d/b/a/ Blue Shield of California (hereinafter, "Blue Shield" or "Defendant"). This lawsuit seeks redress on behalf of all persons, including roughly 4.7 million Blue Shield patients, whose confidential medical and personal information was shared with third parties due to Defendant's actions in violation of HIPAA and guidelines issued by the Department of Health and Human Services that expressly require healthcare providers to prevent this type of information sharing. The technologies that the Defendant implemented allowed third parties to access transmissions as they were being sent, similar to tapping a telephone. There was no way for a reasonable person to understand that the code installed on Blue Shield's operated and owned websites and apps permitted this kind of real time access.

# I.    NATURE OF THE ACTION

1.    On April 9, 2025, Defendant Blue Shield acknowledged that it has disclosed its insureds' ("Members") protected health information ("PHI") and confidential personally identifiable information ("PII") (collectively referred to as "Protected Information") to unauthorized third parties through its Blue Shield websites and Blue Shield mobile web application (the "Web Properties"). The third parties include Google LLC ("Google"). Defendant Blue Shield owned and operated those websites and apps.

2.    Blue Shield authorized and enabled tracking technologies on those Web Properties and apps. These technologies include the Google Analytics tool, and other related tracking and advertising tools such as Google Ads (collectively, "Tracking Technologies" or "Tracking Tools"). These Tracking Technologies allow unauthorized third parties to intercept and read the contents of patients' private communications and access patients' Private Information. Third parties use this private information for their own personal gain and for purposes unrelated to the provision of healthcare, including monetizing it to deliver targeted advertisements to specific individuals.

3.    Blue Shield's Properties are intended to enable Plaintiffs to exchange highly sensitive and personal medical information as part of their healthcare. Blue Shield encouraged and facilitated its Members, including Plaintiffs, to disclose Protected Information on their websites by offering users

online resources to access the healthcare they needed, whether it was obtained through online appointments with registered nurses, via Blue Shield's "NurseHelp," or board-certified licensed doctors, via Blue Shield's "Teladoc Health," or by obtaining information about and scheduling in-person appointments with doctors and specialists within Blue Shield's covered PPO, HMO, dental, and vision networks. Members, including Plaintiffs, also accessed Blue Shield's Web Properties to manage and view claims and review coverage decisions made by Blue Shield. Blue Shield also encouraged its Members, including Plaintiffs, to pay insurance premiums and other healthcare-related bills directly by using the Web Properties' allegedly secure payment options.

4.    Blue Shield designed its Web Properties for use by Members in connection with their health coverage and health care needs, and encouraged the use of Web Properties to navigate their coverage and care needs, instead of other means of obtaining information, such as through direct contact with Blue Shield employees. In designing its Web Properties and encouraging their use by Members, Blue Shield knew or should have known that its Members would use the Web Properties to communicate Protected Information in conjunction with obtaining and receiving medical insurance coverage and medical services from Blue Shield.

5.    Plaintiffs and other Class Members who used Blue Shield's Web Properties reasonably believed they were communicating only with their trusted healthcare and insurance providers. The Tracking Technologies embedded in Blue Shield's Web Properties were not disclosed to Plaintiffs. Those Tracking Technologies include source code that tracked, recorded, and disseminated Plaintiffs' and Class Members' online activity and communications, including their Protected Information, to Google and other third parties. Because those Tracking Technologies were not disclosed and not visible to the average internet user, there is no way a reasonable person could have understood or consented to this tracking. By installing and using Tracking Technologies on its Web Properties, Blue Shield caused Members' confidential communications to be intercepted, accessed, viewed, and captured by third parties in real time, as they were communicated by patients, based on Blue Shield's chosen configuration. For example, Blue Shield installed Google Analytics and related tools that communicate with Google Ads to track users' actions and communications on the Web Properties. Operating as configured and implemented by Blue Shield, Google Analytics and other Tracking Tools

caused Plaintiffs' and Class Members' Protected Information to be unlawfully intercepted and surreptitiously disclosed to third parties.

6.      In violation of HIPAA, state laws, industry standards, and Members' expectations, Blue Shield did not obtain permission from Plaintiffs and Class Members before sharing this information with Google and other third parties.

7.      On April 9, 2025, Blue Shield issued a Notice of Data Breach to insurance plan participants which stated in part the following:[1]

> Blue Shield of California has begun notifying certain members of a potential data breach that may have included elements of their protected health information.
>
> **What happened**
>
> Like other health plans, Blue Shield historically used the third-party vendor service, Google Analytics, to internally track website usage of members who entered certain Blue Shield sites. We were doing this to improve the services we provide to our members.
>
> On February 11, 2025, Blue Shield discovered that, between April 2021 and January 2024, Google Analytics was configured in a way that allowed certain member data to be shared with Google's advertising product, Google Ads, that likely included protected health information. Google may have used this data to conduct focused ad campaigns back to those individual members. We want to reassure our members that no bad actor was involved, and, to our knowledge, Google has not used the information for any purpose other than these ads or shared the protected information with anyone.
>
> Blue Shield severed the connection between Google Analytics and Google Ads on its websites in January 2024. We have no reason to believe that any member data has been shared from Blue Shield's websites with Google after the connection was severed. Upon discovering the issue, Blue Shield immediately initiated a review of its websites and security protocols to ensure that no other analytics tracking software is impermissibly sharing members' protected health information.
>
> **What information was involved**
>
> The information that may have been impacted includes the following:
>
> Insurance plan name, type and group number; city; zip code; gender; family size; Blue Shield assigned identifiers for members' online accounts; medical claim service date and service provider, patient name, and patient financial responsibility; and "Find a

---

[1]  *See* BLUE SHIELD OF CALIFORNIA, "Notice of Data Breach," (Apr. 9, 2025), https://news.blueshieldca.com/notice-of-data-breach.

Doctor" search criteria and results (location, plan name and type, provider name and type).

8.      Blue Shield admits, among other things:

(a)    Blue Shield configured its Web Properties in a way that shared information with Google. While Blue Shield communicated to Members and the public that the disclosure of Member information is a "data breach," Members' information was disclosed by way of unauthorized access to Blue Shield's Web Properties.

(b)    Blue Shield configured its Web Properties in a manner that disclosed Members' information, which "likely included protected health information" including "[i]nsurance plan name, type and group number; city; zip code; gender; family size; Blue Shield assigned identifiers for your online account; medical claim service date and service provider, patient name, and patient financial responsibility; and 'Find a Doctor' search criteria and results (location, plan name and type, provider name and type)."

(c)    Google used this Protected Information to "conduct focused ad campaigns back to those individual members."

(d)    Blue Shield states it did not discover its disclosure of Protected Information to Google until February 2025, despite its assertion that it "severed the connection between Google Analytics and Google Ads on its websites in January 2024."

(e)    Despite severing the connection between Google Ads and Google Analytics, Google continues to use the services of Google Analytics.

(f)    Although Blue Shield admits it learned of the disclosure of Members' Protected Information in February 2025, Blue Shield did not send notification to its affected Members until April 2025.

9.      Subsequent news reports indicated that Blue Shield was notifying 4.7 million people about the data breach, "the majority of its 6 million members."[2] Although Blue Shield stated it had

---

[2] Jessica Roy, "Blue Shield of California shared 4.7M members' private health data with Google," SAN FRANCISCO CHRONICLE (April 24, 2025), https://www.sfchronicle.com/personal-finance/article/blue-shield-california-data-breach-20290464.php.

1    "severed" its connection with Google, it did not indicate whether it "asked Google to delete the data,

2    or if Google has complied."[3] Google informed a reporter that "businesses, not Google, manage the

3    data they collect and must inform users about its collection and use;" Google would not say whether

4    it would delete Blue Shield Members' data.[4]

5         10.     The Office for Civil Rights at the U.S. Department of Health and Human Services

6    ("HHS OCR") offers guidance to entities covered by the Health Insurance Portability and

7    Accountability Act of 1996 ("HIPAA"), including Blue Shield. HHS OCR has issued a Bulletin to

8    "highlight the obligations of HIPAA covered entities and business associates ("regulated entities")

9    under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using

10    online tracking technologies."[5] The Bulletin provides that "**[r]egulated entities are not permitted to**

11    **use tracking technologies in a manner that would result in impermissible disclosures of PHI to**

12    **tracking technology vendors or any other violations of the HIPAA Rules**." (emphasis in original).

13    Blue Shield's configuration and implementation of the Tracking Technologies on its Web Properties

14    clearly violates the HIPAA Rules, as set forth in this HHS OCR guidance.

15         11.     Blue Shield configured its Web Properties such that Protected Information was

16    disclosed to unauthorized third parties such as Google, through which Google and other third parties

17    were informed when Blue Shield Members and/or associated individuals sought or received care,

18    treatment, and diagnoses ("Medical Care") with healthcare providers. This Medical Care was

19    submitted for coverage under Members' Blue Shield insurance plans, which Members managed by

20    submitting claims, paying bills, scheduling appointments, and obtaining other Medical Care-related

21    services. The disclosure of Members' Protected Information did not stop there, as Protected

22    Information was further used or sold to for use in marketing and advertising, without Members'

23    knowledge or authorization.

---

[3] Zack Whittaker, "Blue Shield of California shared the private health data of millions with Google for years," TECHCRUNCH (Apr. 23, 2025), https://techcrunch.com/2025/04/23/blue-shield-of-california-shared-the-private-health-data-of-millions-with-google-for-years/.

[4] *Id.*

[5] *See* U.S. DEPT. OF HEALTH & HUMAN SERV., *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited April 29, 2025).

12.     Blue Shield Members had no reason to anticipate that Blue Shield, a trusted insurer and healthcare provider with an obligation to keep confidential their PHE would disclose their Protected Information to unauthorized third parties for use and sale in advertising. Neither Plaintiffs nor any Class Member consented to Blue Shield's disclosure of their Protected Information to Google, nor did they sign or otherwise authorize Blue Shield to send their Protected Information to Google. And Blue Shield and Google have not entered into a HIPAA-compliant Business Associate Agreement.

13.     HHS OCR warns covered entities such as Blue Shield that:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[6]

(emphasis in original).

14.     Plaintiffs bring this action to seek redress for Blue Shield's illegal conduct in disclosing Members' Protected Information, to enjoin Blue Shield from future disclosure of Members' Protected Information, and to require Blue Shield to fully inform Members regarding the specific Protected Information disclosed through its Web Properties and to identify to Members each third party to which Protected Information was disclosed.

15.     As a result of Blue Shield's conduct, Plaintiffs and Class Members have been injured, including by invasion of privacy, loss of benefit of the bargain, diminution of value of their Protected Information, statutory damages, and the continued and ongoing risk of identity theft and fraud due to the exposure of their Protected Information. Plaintiffs and Class Members must also devote substantial time, money, and energy to monitor and investigate fraudulent activity resulting from the exposure of their Protected Information.

---

[6] *Id.*

16.     Plaintiffs seek to remedy these harms and bring causes of action for (1) violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*; (2) intrusion upon seclusion; (3) breach of confidence; (4) violations of Cal. Penal Code §§ 631, *et seq.*; (5) violations of Cal. Penal Code § 638.51(a); (6) Cal. Civ. Code §§ 56, *et seq.*; (7) violations of Cal. Bus. & Prof. Code §§ 17200, *et seq.*; and (8) violations of Cal. Const. Art. 1 § 1.

## II.    JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which one or more members of the proposed class are citizens of a state different from Defendant. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 2510, *et seq.* (the Electronic Communications Privacy Act).

18.     This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

19.     This Court has personal jurisdiction over Defendant because its headquarters and principal place of business is California. Defendant has also conducted systematic and continuous activities in California; and there is a substantial nexus between the conduct Defendant directs at California and the claims asserted herein.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## III.    DIVISIONAL ASSIGNMENT

21.     Pursuant to Civil L.R. 3-2(c), assignment to this division is proper because a substantial part of the conduct which gives rise to Plaintiffs' claims occurred in this District.

**IV.   PARTIES**

    **A.   Plaintiffs**

    22.    **Plaintiff Jerry Jones** is, and at all relevant times herein has been, a resident and citizen of the State of California.

    23.    **Plaintiff Arturo Garcia** is, and at all relevant times herein has been, a resident and citizen of the State of California.

    24.    **Plaintiff Ronald Weis** is, and at all relevant times herein has been, a resident and citizen of the State of California.

    **B.   Defendant**

    25.    **Defendant California Physicians' Service d/b/a Blue Shield of California** is a mutual benefit corporation and health plan, founded in 1939 by the California Medical Association. It is headquartered in Oakland, California, and serves "nearly 6 million members," with networks covering over 95% of the major metropolitan zip codes in California alone.[7] Defendant owns and controls blueshieldca.com and related webpages (the "Website"), and it also owns and controls a mobile application (the "App") (collectively the "Web Properties").

**V.   FACTUAL ALLEGATIONS**

    **A.   Background**

        **1.   Background of California Invasion of Privacy Act**

    26.    The California Legislature enacted the California Invasion of Privacy Act ("CIPA") to protect the privacy rights of California citizens. In doing so, the California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

    27.    CIPA prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message,

---

[7] BLUE SHIELD OF CALIFORNIA, "Why choose Blue Shield?," https://www.blueshieldca.com/en/employer/why-blue-shield (last visited Apr. 29, 2025).

report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

28. To establish liability under CIPA, Plaintiffs need to establish that Blue Shield does, or did, any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system; or

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state; or

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

29. Violations of CIPA are not limited to phone lines but also apply to "new technologies" such as computers, the Internet, and email.[8]

30. CIPA affords a private right of action to any person who has been subjected to a violation of the statute to seek injunctive relief and statutory damages of $5,000 per violation, regardless as to whether they suffered actual damages. Cal. Penal Code § 637.2(a)(1).

31. Moreover, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

32. A "pen register" is a "device or process that records or decodes dialing, rerouting, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

33. By contrast, a "trap and trace device" is a "device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing,

---

[8] *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

CLASS ACTION COMPLAINT

or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." *Id.*

34.     Put simply, a "pen register" is a "device or process" that records *outgoing* information, whereas a "trap and trace device" is a "device or process" that records *incoming* information.

35.     Although CIPA was enacted before the creation of the Tracking Technologies discussed in this Complaint, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).

36.     Individuals may bring an action against the violator of any provision of CIPA, including § 638.51, for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

## 2.     Background of the Confidentiality of Medical Information Act

37.     Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), "[a] provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization, except as provided in subdivision (b) or (c)." Cal. Civ. Code § 56.10(a). "An authorization for the release of medical information" shall be valid if it:

(a)     Is handwritten by the person who signs it or is in a typeface no smaller than 14-point type.

(b)     Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization.

(c)     Is signed and dated by one of the following:

(1)     The patient. A patient who is a minor may only sign an authorization for the release of medical information obtained by a provider of health care, health care service plan, pharmaceutical company, or contractor in the course of furnishing services to which the minor could lawfully have consented under Part 1 (commencing with § 25) or Part 2.7 (commencing with § 60).

(2)     The legal representative of the patient, if the patient is a minor or an

incompetent. However, authorization may not be given under this subdivision for the disclosure of medical information obtained by the provider of health care, health care service plan, pharmaceutical company, or contractor in the course of furnishing services to which a minor patient could lawfully have consented under Part 1 (commencing with § 25) or Part 2.7 (commencing with § 60).

(3)    The spouse of the patient or the person financially responsible for the patient, where the medical information is being sought for the sole purpose of processing an application for health insurance or for enrollment in a nonprofit hospital plan, a health care service plan, or an employee benefit plan, and where the patient is to be an enrolled spouse or dependent under the policy or plan.

(4)    The beneficiary or personal representative of a deceased patient.

(d)    States the specific uses and limitations on the types of medical information to be disclosed.

(e)    States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

(f)    States the name or functions of the persons or entities authorized to receive the medical information.

(g)    States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information.

(h)    States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information.

(i)    Advises the person signing the authorization of the right to receive a copy of the authorization.

Cal. Civ. Code § 56.11.

11

CLASS ACTION COMPLAINT

38.    Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures. Cal. Civ. Code § 56.36.

39.    "In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning them in violation of this part, for either or both of the following: [¶] (1) ... nominal damages of one thousand dollars ($1,000). To recover under this paragraph, it shall not be necessary that the Plaintiffs suffered or was threatened with actual damages. [¶] (2) The amount of actual damages, if any, sustained by the patient." *Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1551 (2014) (quoting Cal. Civ. Code § 56.36(b)).

### 3.    Google's Advertising and Tracking Tools Including Google Analytics

40.    Google Analytics "is a free web analytics tool that helps website owners track and analyze their online traffic;" it tracks what a user communicates to Defendant's website.[9] Many businesses such as Defendant "routinely use tracking software from companies like Google Analytics to target advertising on the site and improve how the site works."[10]

41.    Notably, transmissions only occur on webpages that contain Tracking Tools.[11] Thus, Plaintiffs' and Class Member's Protected Information would not have been disclosed to Google via this technology but for Defendant's decision to install the Tracking Tools on its Website and configure them such that Protected Information was disclosed to Google's Google Analytics and Google Ads properties.

42.    In this case, Blue Shield installed and configured Tracking Tools, including the Google Analytics tool, to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Protected Information to Google.

---

[9] *Comparing Google Analytics vs Facebook Pixel*, BOLTIC, https://www.boltic.io/blog/google-analytics-vs-facebook-pixel. (last visited April 29, 2025).

[10] Roy, *supra* note 2.

[11] Defendant's Google Analytics tool "stores a client ID in a first-party cookie named _ga [also identified as a CID] to distinguish unique users and their sessions on your website. Analytics doesn't store the client ID when analytics storage is disabled through Consent Mode." https://support.google.com/analytics/answer/11593727?hl=en#. (last visited April 29, 2025).

43.    Based in part upon expert analysis, Blue Shield's Web Property configuration secretly instructed Members' browsers to duplicate and divulge their communications (HTTP Requests) with Blue Shield's Web Properties and to send those communications to Google. These transmissions occurred contemporaneously, invisibly, and without the patient's knowledge or consent.

44.    Thus, without Members' consent, Blue Shield has effectively configured its Web Properties to "tap" its Members' devices, allowing Tracking Entities to intercept Members' communications with Blue Shield, including communications that contain Protected Information.

45.    Blue Shield described its use of the Tracking Tools as to "*internally* track website usage of members who entered certain Blue Shield sites" (emphasis added). However, Blue Shield configured the Tracking Tools to disclose Members' Protected Information *externally*. Blue Shield's Web Properties do not require the Tracking Tools to function.

46.    While seeking and using Defendant's services as an insurance provider and to access and manage their medical care, Plaintiffs and Class Members communicated their Protected Information to Defendant via its Web Properties.

47.    Plaintiffs and Class Members were not aware that their Protected Information would be disclosed to third parties as it was communicated to Blue Shield because, among other things, Blue Shield did not disclose this fact.

48.    Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Protected Information to third parties, nor did they intend for anyone other than Blue Shield to be a party to their communications (many of them highly sensitive and confidential) with Blue Shield.

49.    Defendant's Tracking Tools sent non-public Protected Information to third parties like Google, including but not limited to Plaintiffs' and Class Members': (1) status as medical patients; (2) health conditions; (3) financial obligations arising from obtaining medical care; (4) medical treatment or therapies desired or obtained; (4) preferred locations or facilities where treatment was sought or obtained; (5) searches or queries for conditions, symptoms, care options, or types of providers; (6) searches for specialty treatments by physicians and other healthcare providers conducted via the general search bar; and (7) other information related to their health, care, treatment, and conditions.

50.    In addition to Protected Health Information, the Protected Information Defendant's Tracking Tools divulged included personally identifying information that allowed third parties to connect the Protected Information to a specific patient. Information sent to Google was sent alongside the Plaintiffs' and Class Members' unique identifiers ("_ga" or client ID "CID"), thereby allowing individual patients' communications with Defendant, and the Protected Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.

51.    Similarly, Google users who are logged in to their Google accounts through the browser or device used to interact with Blue Shield Web Properties also have an identifier that is stored in Google's logs. Google logs a user's browsing activities on non-Google websites and uses these data for serving personalized ads.

52.    Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (1) implemented Tracking Tools that surreptitiously tracked, recorded, and disclosed Plaintiffs' and other online patients' confidential communications and Protected Information; (2) disclosed patients' protected information to unauthorized third parties; and (3) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

53.    By configuring and implementing Google Analytics, Defendant caused Plaintiffs' and Class Member's communications to be intercepted by and/or disclosed to Google and for those communications to be personally identifiable.

54.    As explained below, these unlawful transmissions are initiated by Defendant's source code concurrent with communications made via certain webpages.

**B.    Blue Shield Facilitated Third Party Interception of Members' Communications with Its Web Properties and Thus Disclosed Plaintiffs' and Class Members' Protected Information to Third Parties Including Google**

55.    Blue Shield's Web Properties are accessible on mobile devices such as tablets and mobile phones and personal computing devices such as laptop or desktop computers. The Web Properties allow Members to communicate with Blue Shield regarding their health care, including past, present, and future conditions, treatments, care, as well as their past, present, and future insurance coverage, medical bills, financial responsibility, and payments.

56.    Blue Shield encouraged patients to use the Web Properties as the primary means to interact with Blue Shield, including to acquire insurance, identify in-network healthcare providers based on the specific treatment or services they are interested in via the "Find a Doctor" search bar, access information about their insurance coverage, submit claims, pay bills, view records, and more, which necessitated communicating Protected Information to Blue Shield.

57.    Knowing this, Blue Shield installed Tracking Technologies on its Web Properties and configured them to surreptitiously track and share Members' private and protected communications, including Plaintiffs' and Class Members' PHI and PII, which was sent to Google.

58.    The Tracking Technologies intercepted, recorded, and disseminated patients' information as they communicated with Blue Shield via the Web Properties, simultaneously and surreptitiously transmitting the substance of those communications to unintended and undisclosed third parties.

59.    The information Blue Shield configured the Tracking Technologies to send to and be received by third parties includes Protected Information such as:

    a.    Patient Name;

    b.    Insurance plan name, type, and group number;

    c.    Location data such as city, zip code;

    d.    Gender;

    e.    Family size;

    f.    Blue Shield assigned identifiers for Members' online accounts;

    g.    Medical claim service date and service provider;

    h.    "Find a Doctor" search criteria and results (location, plan name and type, provider name and type); and

    i.    Patient financial responsibility.

60.    The information tracked, intercepted, collected, and disclosed by and through Blue Shield's Tracking Tools is identifying, not anonymous, and is viewed and categorized by the intercepting party on receipt.

61.    The Protected Information disclosed to and intercepted by Google includes identifying information, including name, location, and household that allows third parties to know exactly the individual and household for whom they have acquired information.

62.    Google "stores users' logged-in identifier on non-Google websites in its logs. Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and nonprivate) within the same logs and uses these data for serving personalized ads.

63.    Simply put, the Protected Information that was disclosed via the Tracking Tools installed by Blue Shield is personally identifiable in and of itself, and was disclosed alongside additional persistent identifiers such as IP addresses, device identifiers, and Google-assigned identifiers.[12]

64.    As identified by HHS OCR, this is PHI because "the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care."[13]

65.    Blue Shield's Web Properties' Google Analytics tools sent Protected Information to Google, including but not limited to information about Plaintiffs' and Class Members' past, present, or future health or health care and payment for past, present, or future health care.

66.    Importantly, the Protected Information Google received was sent alongside Plaintiffs' and Class Members' IP addresses, CIDs, and other persistent device identifiers.

67.    Google Analytics uses both first- and third-party cookies, and both were used on the Web Properties. It is essentially impossible for website users to block first-party cookies such as the _ga cookie, and even if a website user is able to block such cookies using specialized tools and knowledge, doing so typically degrades website functionality.

---

[12] *Id.*

[13] *See* U.S. DEPT. OF HEALTH & HUMAN SERV., *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, *supra* note 5, at § *How do the HIPAA Rules apply to regulated entities' use of tracking technologies?*

CLASS ACTION COMPLAINT

68.     Blue Shield used Google Analytics and related tools that communicate with Google Ad Services and DoubleClick, all of which were installed by Blue Shield on its Web Properties. Though Blue Shield claims to have "severed" the Google Analytics and associated Tracking Technologies as of January 2024, as of April 21, 2025, Google Tag Manager was still in use.

69.     Google Tag Manager ("GTM") is a free tracking tool and management platform that allows a developer to add marketing tags, or snippets of code, to its website to track and collect marketing data. It allows developers to easily implement GTM tags without modifying the code while improving the amount and type of information gathered.[14] A developer can "[u]se Tag Manager to manage tags (such as measurement and marketing optimization JavaScript tags) on your site. Without editing your site code, use Tag Manager to add and update Google Ads, Google Analytics, Floodlight, and third-party tags."[15]

70.     Tags are small pieces of code that track user activity, send data to analytics platforms, or trigger specific actions on the users' website.

71.     While Google Analytics is the hub for analyzing website data, Google Tag Manager is the tool for transmitting the data points. GTM essentially controls what information is sent to Google Analytics in order to be analyzed. GTM is the platform for deploying and storing the tags without the capacity to examine analyzed reports, which is why the data is sent to Google Analytics. Together, Google Tag Manager and Google Analytics track and create analytics relating to a website.[16]

72.     GTM facilitates tracking of PDF downloads, scrolling behavior, link clicks, form submissions, video activity, and more.[17]

---

[14] EVOLVE SYSTEMS, "What Does Google Tag Manager Do? The Benefits of Google Tag Manager and What to Track," (Mar. 15, 2022), https://evolve-systems.com/blog/what-does-google-tag-manager-do-the-benefits-of-google-tag-manager-andwhat-totrack/#:~:text=Google%20Tag%20Manager%20(GTM)%20is%0a%20free,website%20to%20track%20and%20collect%20marketing%20data.

[15] GOOGLE FOR DEVELOPERS, "About Google Tag Manager," (last updated Feb. 4, 2025), https://developers.google.com/tag-platform/tag-manager.

[16] EVOLVE SYSTEMS, "What Does Google Tag Manager Do? The Benefits of Google Tag Manager and What to Track," *supra* note 16.

[17] *Id.*

CLASS ACTION COMPLAINT

73.     Google views, uses, and monetizes the data it receives for marketing and links Protected Information to other information in its possession.

74.     Blue Shield did not disclose that the Tracking Technologies it embedded in its Web Properties intercept, transmit, record, and disseminate Plaintiffs' and Class Members' Protected Information to Google or additional third parties who use Google's marketing services.

75.     Moreover, Blue Shield never received consent or written authorization to disclose Plaintiffs' and Class Members' Protected Information in this manner.

**C.      Plaintiffs' and Class Members' Protected Information Was Viewed and Used by Unauthorized Third Parties such as Google**

76.     Tracking Technologies are not "free" to companies like Defendant, nor do they inure solely for Defendant's benefit. "The world's most valuable resource is no longer oil, but data,"[18] and Google's online advertising business generated 42.4% of total global digital ad revenue in 2023.[19]

77.     The large volumes of personal and sensitive health-related data Defendant divulged were viewed, examined, analyzed, curated, and used by Google for its online advertising business.

78.     Technology companies acquire raw data to transform it into a monetizable commodity, just as an oil company acquires crude oil to transform it into gasoline. Google offers Tracking Tools like Google Analytics "free of charge," but the real price that Defendant paid was the data it allowed Google to intercept from Plaintiffs' and Class Members' devices, and the data that it disseminated directly to Google from Blue Shield's own servers.

79.     In answer to the question, "Why do advertisers want my health information?" an article in the San Francisco Chronicle notes that:

> Information like your gender, where you live, whether you're married or have children and what types of doctors you've searched for is valuable to advertisers seeking to maximize their marketing dollars by only showing ads to relevant audiences. A company may only want its ads shown to, for instance, women in the Bay Area who

---

[18] THE ECONOMIST, "The world's most valuable resource is no longer oil, but data," (May 6, 2027) https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data.

[19] Melissa Otto, "Global Digital Advertising Revenues – A Look at the Big Three: Alphabet (GOOGL), Meta Platforms (META), Amazon.com (AMZN)," VISIBLE ALPHA (May 17, 2023) https://visiblealpha.com/blog/global-digital-advertising-revenues-a-look-at-the-big-three-alphabet-googl-meta-platforms-meta-amazon-com-amzn/.

already have at least one child and have recently looked for a new OB/GYN, or single men in California who don't have a primary care doctor, or people who are undergoing treatment for conditions like cancer or diabetes.[20]

80.    Even if Google eventually deletes or anonymizes sensitive information that it receives, it must review and process the information in order to identify it as sensitive information suitable for removal. Accordingly, there is a breach of confidentiality the instant the information is disclosed or received without authorization. As described by the HHS Bulletin:

> It is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place **and** requires that there is an applicable Privacy Rule permission for disclosure.[21]

**D.    Defendant Was Enriched and Benefitted from the Use of the Tracking Technology and Protected Information Has Financial Value**

81.    The Tracking Technologies served the purpose of bolstering Defendant's profits via marketing and advertising. In exchange for bartering away and disclosing the Protected Information of its patients and customers, Blue Shield is compensated by Google in the form of enhanced advertising services and more cost-efficient marketing, including retargeting. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. By utilizing the Tracking Technologies, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

82.    Blue Shield's disclosure of Protected Information harmed Plaintiffs and Class Members. Conservative estimates suggest that as of 2022, revenues from mining and selling user data were as high as $434 per user, constituting over $200 billion industry wide.[22]

83.    The value of health data in particular is well-known. RBC Capital Markets and others describe the market for health data as a "gold rush."[23]

---

[20] Roy, *supra* note 2.

[21] *See* U.S. DEPT. OF HEALTH & HUMAN SERV., *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, *supra* note 5 (emphasis in original).

[22] *Id.*

[23] *See The Convergence of Healthcare and Technology*, RBC CAPITAL MARKETS, https://www.rbccm.com/en/gib/healthcare/episode/the_healthcare_data_explosion#content-panel (last visited April 29, 2025).

CLASS ACTION COMPLAINT

84.     Similarly, CNBC published an article in 2019 in which it observed that "[d]eidentified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[24] Accordingly, patient data that can be linked to a specific individual is even more valuable.

85.     There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

86.     Several companies have products through which they pay consumers for a license to track their data. Google Screenwise, Nielsen, Caden, MobileXpression, Reklaim, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for historical browsing information and device usage data.

87.     Similarly, Meta established its own "Facebook Research" app through which it paid users $20 a month for a license to collect browsing history, communications, and other data from consumers between the ages of 13 and 35. Meta also gathered data through third-party panels such as Viewpoints and Yougov, collecting browsing history information, health information, and purchase history from consumers.

88.     Healthcare records are extremely valuable, with estimates ranging from $60 to up to $1,000 per record on the black market.[25]

89.     In addition, numerous services exist that charge fees to monitor and remove personal information from data brokers and search databases. For example, companies such as BitDefender,

---

[24] *See* Christina Farr, "Hospital execs say they are getting flooded with requests for your health data," CNBC (Dec. 19, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

[25] Chrissa McFarlane, "*The Wake-Up Call: Your Health Data Is At Risk*," FORBES (March 29, 2025), https://www.forbes.com/sites/chrissamcfarlane/2025/03/29/the-wake-up-call-your-health-data-is-at-risk/.

CLASS ACTION COMPLAINT

Kanary, and Privacy Bee offer data removal and privacy services.[26] Other similar services exist today, such as Optery and DeleteMe, which remove information from all major data broker websites.[27]

### E.    Defendant Violated HIPAA and Industry Standards

90.    In December 2022, HHS issued a bulletin (the "HHS Bulletin") warning regulated entities like Defendant about the risks presented by the use of Tracking Tools on their websites:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[28]

91.    In other words, the HHS OCR clearly and expressly stated that entities who implement Tracking Tools without obtaining HIPAA-complaint authorization from their patients violate HIPAA Rules.

92.    HHS OCR further warns that:

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[29]

93.    In addition, HHS and the FTC have admonished entities like Defendant to stop using Tracking Tools:

> If you are a covered entity or business associate ("regulated entities") under HIPAA, you must comply with the HIPAA Privacy, Security, and Breach Notification Rules (HIPAA Rules), with regard to protected health information (PHI) that is transmitted or maintained in electronic or any other form or medium. ***The HIPAA Rules apply when the information that a regulated entity collects through tracking technologies***

---

[26] BITDEFENDER, "Bitdefender Digital Identity Protection," https://www.bitdefender.com/en-us/consumer/digital-identity-protection (last visited Apr. 29, 2025); KANARY, https://www.kanary.com/ (last visited Apr. 29, 2025); PRIVACY BEE, "Simple Pricing for Advanced Privacy," https://privacybee.com/pricing/ (last visited Apr. 29, 2025).

[27] OPTERY, "Pricing for Everyone," https://www.optery.com/pricing/ (last visited Apr. 29, 2025); DELETEME, "Save More With Our Best Value and Most Popular DeleteMe Plans," https://joindeleteme.com/pricing/ (last visited Apr. 29, 2025).

[28] *See* U.S. DEPT. OF HEALTH & HUMAN SERV., *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, *supra* note 5.

[29] *Id.*

***or discloses to third parties (e.g., tracking technology vendors) includes PHI***. . . Even if you are not covered by HIPAA, you still have an obligation to protect against impermissible disclosures of personal health information under the FTC Act and the FTC Health Breach Notification Rule. . . As recent FTC enforcement actions demonstrate, it is essential to monitor data flows of health information to third parties via technologies you have integrated into your website or app. The disclosure of such information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule.[30]

94.     Under Federal Law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[31]

95.     The HIPAA Privacy Rule, located at 45 C.F.R. Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[32]

96.     The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

97.     IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) "identifies the

---

[30] U.S. DEPT. OF HEALTH & HUMAN SERV. & FED. TRADE COMM'N, *Re: Use of Online Tracking Technologies*, (July 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf.

[31] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 164.508(a)(3), 164.514(b)(2)(i).

[32] U.S. DEPT. OF HEALTH & HUMAN SERV., "HIPAA For Professionals," (last reviewed July 19, 2024), https://www.hhs.gov/hipaa/for-professionals/index.html .

individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

98.     The HIPAA de-identification rule states that "health information is not individually identifiable only if" an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and that expert "documents the methods and results of the analysis that justify such determination;" or if "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed," including names, medical record numbers, health plan beneficiary numbers, account numbers, URLs, Internet Protocol (IP) address numbers, and "[a]ny other unique identifying number, characteristic, or code." In addition, the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514.

99.     The HIPAA Privacy Rule further requires any "covered entity" to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

100.     An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d–1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

101.     The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it knowingly discloses individually identifiable health information relating to an individual, as those terms are defined under HIPAA. In addition, there is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health

information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both." 42 U.S.C. § 1320d-6(b).

102.    In its Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the HHS instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[33]

103.    In its guidance for Marketing, the HHS further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (emphasis added).[34]

104.    As alleged above, there is an HHS Bulletin that highlights the obligations of "regulated entities," which are HIPAA-covered entities and business associates, when using tracking technologies.[35]

---

[33] U.S. DEPT. OF HEALTH & HUMAN SERV., "Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule," (last reviewed Feb. 3, 2025), https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html.

[34] U.S. DEPT. OF HEALTH & HUMAN SERV., "Marketing," (last reviewed July 26, 2013), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

[35] *See* U.S. DEPT. OF HEALTH & HUMAN SERV., "Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates," (last reviewed June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

105.   The Bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

106.   Defendant's actions violated HIPAA Rules.

**F.    IP Addresses, Mobile Advertising IDs, and Other Devices Identifiers Constitute Personally Identifiable Information**

107.   Blue Shield also disclosed and otherwise assisted third parties with intercepting Plaintiffs' and Class Members' IP addresses, Mobile Advertising IDs, and other device identifiers that are uniquely linked to specific individuals.

108.   An IP address is a number that identifies the address of a device connected to the Internet, and it is used to identify and route communications on the Internet.

109.   Internet service providers, websites, and third-party tracking companies use an individual's IP addresses to facilitate and track Internet communications.

110.   As noted above, Defendant used Google Analytics tools, Google Tag Manager, and DoubleClick tracking tools without anonymizing users' IP addresses.

111.   Under HIPAA, an IP address is considered personally identifiable information:

    a.   HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514(2).

    b.   HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also* 45 C.F.R. § 164.514(b)(2)(i)(O).

112.   Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

113.   Likewise, on information and belief, the Tracking Tools used by Defendant also transmitted users' Mobile Advertising IDs ("MAID") and may have transmitted Android Advertising

IDs ("AAID"), Router SSIDs, Hardware IDs, International Mobile Equipment Identity numbers ("IMEI"), and other persistent identifiers.

114.    According to the FTC, "MAIDs and other persistent identifiers, by design, enable direct communication with individual consumers, are used to amass profiles of individuals over time and across different web and mobile services, and are the basis to make decisions and insights about individual consumers."[36]

### G.    Plaintiffs' Experience with Defendant's Web Properties

115.    **Plaintiff Jerry Jones** has been insured by Blue Shield and used Blue Shield's services for several years.

116.    As a member of Blue Shield's insurance plans, and in order to obtain medical treatment and insurance services, Plaintiff Jones accessed and used Blue Shield's Web Properties on his computer. He has used this same device to access his Google account and email, and he stays logged into these accounts.

117.    Plaintiff Jones communicated his Protected Information to Blue Shield when he used the Web Properties, and he used the "Find a Doctor" form and webpage to identify a healthcare provider.

118.    Plaintiff Jones used the filtering feature to obtain the narrowest selection, which communicated the following: (1) the type of physician or medical provider he was seeking; (2) the specific medical services he was seeking; (3) his location; and (4) additional details about his desired physician and their practice area.

119.    Upon entering his Protected Information and clicking the "Search" button, his search parameters and the contents of his communications were sent to Google alongside his IP address, Google Client ID, and additional persistent identifiers that reveal his identity.

120.    Plaintiff Jones reasonably expected that—as a health plan member seeking medical treatment and services—his Protected Information and communications were confidential and would

---

[36] *See In the Matter of Gravy Analytics, Inc., a corporation, and Venntel, Inc., a corporation* (Compl. 212-3025), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/2123035gravyanalytics complaint.pdf.

not be received by Google or other unknown third-parties, or used for marketing purposes, without his express written consent.

121.    He received an email from Defendant on or around April 10, 2025, informing him about the privacy breach described in this Complaint.

122.    As a result of Defendant's unauthorized disclosure of his Private Information, Plaintiff Jones suffered significant harm, including invasion of his privacy, lost benefit of the bargain damages incurred because he overpaid for insurance services he believed included data security sufficient to maintain his Private Information as confidential, diminution in the value of his Private Information, an increased risk of identity theft and fraud, and lost time spent investigating the disclosure and monitoring for fraud and identity theft.

123.    **Plaintiff Arturo Garcia** has been insured by Blue Shield and used Blue Shield's services for several years.

124.    As a member of Blue Shield's insurance plans, and in order to obtain medical treatment and insurance services, Plaintiff Garcia accessed and used Blue Shield's Web Properties on his phone and computer. He has used these same devices to access his Google account and email, and he stays logged into these accounts.

125.    Plaintiff Garcia communicated his Protected Information to Blue Shield when he used the Web Properties, and he used the "Find a Doctor" form and webpage to identify a healthcare provider.

126.    Plaintiff Garcia used the filtering feature to obtain the narrowest selection, which communicated the following: (1) the type of physician or medical provider he was seeking; (2) the specific medical services he was seeking; (3) his location; and (4) additional details about his desired physician and their practice area.

127.    Upon entering his Protected Information and clicking the "Search" button, his search parameters and the contents of his communications were sent to Google alongside his IP address, Google Client ID, and additional persistent identifiers that reveal his identity.

128.    Plaintiff Garcia reasonably expected that—as a health plan member seeking medical treatment and services—his Protected Information and communications were confidential and would

not be received by Google or other unknown third-parties, or used for marketing purposes, without his express written consent.

129.    He received an email from Defendant on or around April 10, 2025, informing him about the privacy breach described in this Complaint.

130.    As a result of Defendant's unauthorized disclosure of his Private Information, Plaintiff Garcia suffered significant harm, including invasion of his privacy, lost benefit of the bargain damages incurred because he overpaid for insurance services he believed included data security sufficient to maintain his Private Information as confidential, diminution in the value of his Private Information, an increased risk of identity theft and fraud, and lost time spent investigating the disclosure and monitoring for fraud and identity theft.

131.    **Plaintiff Ronald Weis** has been insured by Blue Shield and used Blue Shield's services for several years.

132.    As a member of Blue Shield's insurance plans, and in order to obtain medical treatment and insurance services, Plaintiff Weis accessed and used Blue Shield's Web Properties on his computer and his smart phone. He has used this same device to access his Google account and email, and he stays logged into these accounts.

133.    Plaintiff Weis communicated his Protected Information to Blue Shield when he used the Web Properties, and he used the "Find a Doctor" form and webpage to identify a healthcare provider.

134.    Plaintiff Weis used the filtering feature to obtain the narrowest selection, which communicated the following: (1) the type of physician or medical provider he was seeking; (2) the specific medical services he was seeking; (3) his location; and (4) additional details about his desired physician and their practice area.

135.    Upon entering his Protected Information and clicking the "Search" button, his search parameters and the contents of his communications were sent to Google alongside his IP address, Google Client ID, and additional persistent identifiers that reveal his identity.

136.    Plaintiff Weis reasonably expected that—as a health plan member seeking medical treatment and services—his Protected Information and communications were confidential and would

1  not be received by Google or other unknown third-parties, or used for marketing purposes, without his

2  express written consent.

3          137.    He received an email from Defendant on or around April 10, 2025, informing him about

4  the privacy breach described in this Complaint.

5          138.    As a result of Defendant's unauthorized disclosure of his Private Information, Plaintiff

6  Weis suffered significant harm, including invasion of his privacy, lost benefit of the bargain damages

7  incurred because he overpaid for insurance services he believed included data security sufficient to

8  maintain his Private Information as confidential, diminution in the value of his Private Information,

9  an increased risk of identity theft and fraud, and lost time spent investigating the disclosure and

10  monitoring for fraud and identity theft.

11          139.    The risk to Plaintiffs' and other patients' privacy is ongoing in nature because the

12  Protected Information Google received can be used for years to come. Additionally, a portion of

13  Google's tracking tools are still operating on Defendant's web properties as of April 21, 2025.

14          140.    Importantly, many companies are using data obtained by Tracking Tools to decide

15  whether to raise insurance premiums or deny coverage.[37]

16          141.    Through the process detailed in this Complaint, Blue Shield unlawfully assisted Google

17  with intercepting Plaintiffs' communications and health information via Google Analytics, breached

18  confidentiality, violated Plaintiffs' right to privacy, and unlawfully disclosed their personally

19  identifiable information and protected health information.

20          142.    Plaintiffs were unaware that Blue Shield installed Tracking Tools on its Web Properties

21  because, amongst other things, the Tracking Tools were and are completely invisible, and Plaintiffs

22  reasonably believed their health insurance provider would safeguard their privacy in compliance with

23  industry standards, HIPAA, and relevant laws.

24

25

---

26  [37] *See In re Consumer Vehicle Driving Data Tracking Litig.*, 737 F. Supp. 3d 1355 (U.S. Jud. Pan.
Mult. Lit. 2024) (alleging General Motors and OnStar improperly used Tracking Tools to disseminate

27  information to third parties); *see also The State of Texas v. The Allstate Corporation, et al.*, No. 25-
01-00561 (Dist. Ct. of Tex., Montgomery Cty.) (*available at* https://www.texasattorneygeneral.gov

28  /sites/default/files/images/press/Allstate%20and%20Arity%20Petition%20Filed.pdf).

143.     Plaintiffs have a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from future unauthorized disclosure and to know the precise categories of information disclosed, to whom it was disclosed, and why it was disclosed.

## VI.      TOLLING OF THE STATUTES OF LIMITATIONS

144.     Any applicable statute of limitations has been tolled by the "delayed discovery" rule. As reasonable users of a technology that Blue Shield encouraged them to use, Plaintiffs did not know that their Protected Information was intercepted and unlawfully disclosed to Google or any other third parties in the manner described herein because: (1) Defendant kept this information secret, and (2) the Tracking Tools are invisible on Defendant's the Web Properties. This only has become clear through testing by experts following Blue Shield's disclosure that 4.7 million members have been affected.

## VII.     CLASS ACTION ALLEGATIONS

145.     Plaintiffs bring this action pursuant to Rule 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) of the Federal Rules of Civil Procedure, on behalf of Plaintiffs, and the following class and subclasses (collectively, the "Class"):

> **The Nationwide Class**: United States citizens who, during the Class Period, used Defendant's Web Properties and had their personally identifiable information and/or protected health information disclosed to Google or other third parties as a result of using the Web Properties.

> **California Subclass**: All California residents who, during the Class Period, used Defendant's Web Properties and had their personally identifiable information and/or protected health information disclosed to Google or other third parties as a result of using the Web Properties.

146.     Plaintiffs reserve the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

147.     The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgement or preliminary approval of a settlement.

148.     Excluded from the proposed Class are: Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer director, or

employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

149.    **Numerosity (Fed. R. Civ. P. 23(a)(1)).** Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiffs currently. However, it is estimated that there are thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records, including records of all people to whom Defendant sent the Notice of Data Breach.

150.    **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3)).** Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct. The following questions of law and fact are common to the Class:

    a)    Whether Blue Shield intentionally tapped the lines of internet communication between patients and their medical providers;

    b)    Whether the Web Properties surreptitiously track PII, PHI, and related communications and simultaneously disclose(d) that information to Google and/or other third parties;

    c)    Whether Google is a third-party eavesdropper;

    d)    Whether Blue Shield's disclosures of PII, PHI, and related communications constitute an affirmative act of communication;

    e)    Whether Blue Shield's conduct, which allowed third parties to view Plaintiffs' and Class Members' PII and PHI, resulted in a breach of confidentiality;

    f)    Whether Blue Shield's conduct, which allowed third parties to view Plaintiffs' and Class Members' PII and PHI, resulted in a breach of confidence;

    g)    Whether Blue Shield violated Plaintiffs' and Class Members' privacy rights by using Tracking Technologies to communicate patients' Protected Information to third parties;

h)    Whether Blue Shield's actions violated the Unfair Competition Law;

i)    Whether Blue Shield's actions violated Plaintiffs' and Class Members' privacy rights as provided by the California Constitution;

j)    Whether Blue Shield violated HIPAA; and

k)    Whether Plaintiffs and Class Members are entitled to damages.

151.    **Typicality (Fed. R. Civ. P. 23(a)(3)).** Plaintiffs' claims are typical of the claims of the Class because Plaintiffs had their personally identifiable information and protected health information disclosed to third parties such as Google without their express written authorization or knowledge. Plaintiffs' claims are based on the same legal theories as the claims of other Class Members

152.    **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)).** Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiffs' interests coincide with, and are not antagonistic to, those of the Class Members. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

153.    **Superiority (Fed. R. Civ. P. 23(b)(3)).** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiffs are unaware of any special difficulty that may arise in litigating this action that would preclude its maintenance as a class action.

154.    Class certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

CLASS ACTION COMPLAINT

a)    The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendant;

b)    The prosecution of separate actions by individual Class Members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

c)    Defendant has acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole; and

d)    The claims of Class Members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

## VIII.   CAUSES OF ACTION

<u>**COUNT I**</u>
**Violation of the Electronic Communications Privacy Act ("ECPA"),**
**18 U.S.C. §§ 2510, *et seq.***
**(On Behalf of Plaintiffs and the Nationwide Class)**

155.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

156.    The Federal Wiretap Act ("FWA"), as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

157.    In relevant part, the ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

158.    The ECPA protects both sending and receipt of communications.

159.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

160.    The transmissions of Plaintiffs' Protected Information via Blue Shield's Web Properties qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

161.    **Electronic Communications.** The transmission of Protected Information between Plaintiffs and Class Members and Blue Shield via its Web Properties are "transfer[s] of signs, signals, writing, … data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

162.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

163.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

164.    **Electronic, Mechanical, or Other Device.** The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

   a) Plaintiffs' and Class Members' browsers;

   b) Plaintiffs' and Class Members' computing devices and mobile devices;

   c) Blue Shield's web-servers; and

   d) The Tracking Tools deployed by Blue Shield to effectuate the sending and acquisition of patient communications.

165.    When Plaintiffs and Class Members interacted with Blue Shield's Web Properties, Blue Shield, through the Tracking Tools embedded and operating on its Web Properties, contemporaneously and intentionally disclosed, used, and redirected, and endeavored to disclose, use, and redirect, the contents of Plaintiffs' and Class Members' electronic communications to third parties,

including Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA. 18 U.S.C. § 2511(1)(c)–(d).

166.   Blue Shield's intercepted communications include, but are not limited to, the contents of communications to/from Plaintiffs and Class Members regarding PII and PHI.

167.   By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to third parties while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Blue Shield violated 18 U.S.C. § 2511(1)(c)–(d).

168.   Blue Shield intentionally used the wire or electronic communications to increase its profit margins, and it specifically used the Tracking Tools to track and utilize Plaintiffs' and Class Members' PII and PHI for financial gain.

169.   Blue Shield was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

170.   Plaintiffs and Class Members did not authorize Blue Shield to acquire the content(s) of their communications via the Tracking Tools.

171.   Any purported consent Blue Shield received from Plaintiffs and Class Members was not valid.

172.   **Unauthorized Purpose.** Blue Shield intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State—namely, violations of HIPAA, breaches of confidence, invasion of privacy, and violations of state privacy laws.

173.   The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

174.   Blue Shield is a "party to the communication" with respect to Plaintiffs' and Class Members' communications, but its simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Protected Information does not qualify for the party exemption.

175. More specifically, Blue Shield's acquisition of Plaintiffs' and Class Members' communications, which were used and disclosed to unauthorized third parties, was done for the purpose of committing criminal and tortious acts in violation of the laws of the United States and California, including:

        i.      42 U.S.C. § 1320d-6;

        ii.     45 C.F.R. § 164.508(a)(1);

        iii.   Cal. Penal Code §§ 631, *et seq.*;

        iv.   Cal. Penal Code § 638.51(a);

        v.    Cal. Civ. Code §§ 56, *et seq.*;

        vi.   Cal. Bus. & Prof. Code § 17200; and

        vii.  The common law causes of action alleged herein.

176. Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person … without authorization" from the patient.

177. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

178. Blue Shield's conduct violated 42 U.S.C. § 1320d-6 in that it:

    a)   Used and caused to be used persistent identifiers associated with specific patients without patient authorization; and

    b)   Disclosed individually identifiable health information to Google and other unauthorized parties without patient authorization.

179. Blue Shield's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Blue Shield's use of the Tracking Technology was for its commercial advantage to increase revenue from existing patients and gain new patients.

180. Blue Shield is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiffs' and Class Members' communications because Blue Shield used its participation in these communications to improperly share Protected Information with third parties that did not participate in these communications (e.g., Google) when Plaintiffs and Class

Members: (1) were unaware those third parties would receive their Protected Information; and (2) did not consent to those third parties receiving their Protected Information.

181.    Blue Shield accessed, obtained, and disclosed Plaintiffs' and Class Members' Protected Information for the purpose of committing the crimes and torts described herein because it would not have been able to obtain the information or the marketing services if it had complied with the law.

182.    As such, Blue Shield cannot viably claim any exception to ECPA liability.

183.    Plaintiffs and Class Members have suffered damages as a direct and proximate result of Blue Shield's invasion of privacy.

184.    As a result of Blue Shield's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorneys' fees and costs.

**COUNT II**
**Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Nationwide Class)**

185.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

186.    Plaintiffs and Class Members had a reasonable expectation of privacy in their communications with Blue Shield via its Web Properties.

187.    Plaintiffs and Class Members communicated sensitive and protected medical information and individually identifiable information that they intended for only Blue Shield to receive and which they understood Blue Shield would keep private as their insurance provider and healthcare provider.

188.    Blue Shield's disclosure of the substance and nature of Plaintiffs' and Class Members' communications to third parties without their knowledge and consent is an intentional intrusion on Plaintiffs' and Class Members' solitude or seclusion.

189.    Plaintiffs and Class Members had a reasonable expectation that their communications, identity, health information and other data would remain confidential, and that Blue Shield would not

install: (1) wiretaps to secretly transmit their communications to unauthorized third parties; or (2) pin registers and/or trap and trace devices.

190.   Blue Shield was authorized to receive Plaintiffs' and Class Members' Protected Information, but it was not authorized to commandeer Plaintiffs' and Class Members' web browsers and devices, thereby forcing those devices to transmit information to Google without their consent or authorization.

191.   As such, Blue Shield obtained Plaintiffs' and Class Members' Protected Information under false pretenses and/or exceeded its authority to obtain the Protected Information.

192.   As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

193.   Plaintiffs and Class Members have been damaged as a direct and proximate result of Blue Shield's invasion of their privacy and are entitled to just compensation, including monetary damages.

194.   Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests.

195.   Plaintiffs and Class Members also seek punitive damages resulting from the malicious, willful, and intentional nature of Blue Shield's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Blue Shield from engaging in such conduct in the future.

196.   Plaintiffs also seek such other relief as the Court may deem just and proper.

**COUNT III**
**Common Law – Breach of Confidence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

197.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

198.   Plaintiffs and Class Members disclosed their Protected Information in confidence to Blue Shield through Blue Shield's Web Properties.

199.    Plaintiffs and Class Members have an interest in keeping their protected private and medical information confidential.

200.    Defendant knew that the information disclosed by Plaintiffs in confidence is PHI and PII, and that such information is confidential and protected by federal and state laws.

201.    Plaintiffs and Class Members had an expectation that the confidential information disclosed to Defendant would be kept in confidence due to their relationship with Defendant as their health services provider, and due to federal and state laws that protect such information.

202.    Blue Shield violated its duty to protect the confidentiality of Plaintiffs' and Class Members' information by using Tracking Tools to disclose Plaintiffs' and Class Members' Protected Information to unauthorized third parties.

203.    Blue Shield disclosed Plaintiffs' and Class Members' confidential information for its own economic benefit and without Plaintiffs' and Class Members' consent.

204.    Blue Shield disclosed and disseminated Plaintiffs' and Class Members confidential communications to a broad audience including Google and others.

205.    At no time did Blue Shield offer to purchase or financially compensate Plaintiffs and Class Members for the use of their confidential information for Blue Shield's advertising purposes.

206.    As a result of Blue Shield's actions, Plaintiffs and Class Members suffered harm and injury, including but not limited to a breach of their confidence, were damaged as a direct and proximate result of Blue Shield's breach, and seek just compensation, including monetary damages.

207.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**<u>COUNT IV</u>**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code §§ 631, *et seq.***
**(On Behalf of Plaintiffs and the California Subclass)**

208.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein and bring this count individually and on behalf of the proposed Class.

209.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638. The Act begins with its statement of purpose.

The Legislature thereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon

39

private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

210.     California Penal Code § 631(a) provides, in pertinent part (emphasis added):

Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

211.     Under CIPA, Blue Shield must show it had the consent of all parties to a communication.

212.     At all relevant times, Blue Shield aided, employed, agreed with, and conspired with third parties, including Google, to track and intercept Plaintiffs' and Class Members' internet communications. These communications were transmitted to and intercepted by a third party during the communication and without the knowledge, authorization, or consent of Plaintiffs and Class Members.

213.     Blue Shield intentionally inserted an electronic listening device onto Plaintiffs' and Class Members' web browsers and devices that, without their knowledge and consent, tracked and transmitted the substance of their confidential communications to Google and other unauthorized third parties—each of whom constitute a "person" within the meaning of the statute.

214.     Blue Shield willingly facilitated the interception and collection of Plaintiffs' and Class Members' Protected Information by embedding Google Analytics on its Web Properties.

215.     Moreover, modern Tracking Tools like Google Tag Manager, Google Analytics, and the other Tracking Tools are completely invisible to website and app users. Blue Shield has full control over these tools, including where they are embedded, what information is tracked and transmitted, and how events are categorized prior to their transmission.

216.    Blue Shield's Tracking Technologies constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, they fall under the broad catch-all category of "any other manner."

217.    Blue Shield failed to disclose its use of the Tracking Technologies to specifically track and automatically and simultaneously transmit Plaintiffs' and Class Members' communications to Google and other undisclosed third parties.

218.    A portion of the Tracking Technologies—such as Google Analytics and Google Tag Manager—are designed to transmit a website user's actions and communications contemporaneously as the user initiates each communication. As a result, the user's communications are intercepted in transit to the intended recipient—Blue Shield—before reaching Blue Shield's server.

219.    Blue Shield violated CIPA by aiding and permitting third parties to intercept and receive its patients' online communications in real time as they were made. Importantly, Google and other unauthorized third parties would not have intercepted or received the contents of these communications but for Blue Shield's actions, including its decision to install the Tracking Tools on its Web Properties.

220.    By disclosing Plaintiffs' and Class Members' Protected Information, Blue Shield violated Plaintiffs' and Class Members statutorily protected right to privacy.

221.    As a result of the above violations, and pursuant to Cal. Penal Code § 637.2, Blue Shield is liable to Plaintiffs and Class Members for three times the amount of actual damages sustained by Plaintiffs or for statutory damages in the amount of $5,000 per violation. Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

222.    Under the statute, Blue Shield is also liable for reasonable attorneys' fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

CLASS ACTION COMPLAINT

**COUNT V**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 638.51(a)**
**(On Behalf of Plaintiffs and the California Subclass)**

223.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

224.    Cal. Penal Code § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

225.    A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of the communication." Cal. Penal Code § 638.50(b).

226.    The Tracking Tools are "pen registers" because they are device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information" from Plaintiffs and Class Members' electronic communications. *Id.*

227.    At all relevant times, Blue Shield installed the Tracking Tools—which are pen registers—onto Plaintiffs' and Class Members' browsers, and it used the Tracking Tools to capture Plaintiffs' and Class Members' Protected Information.

228.    Plaintiffs and Class Members did not provide their consent to Blue Shield's installation or use of the Tracking Tools.

229.    Blue Shield did not obtain a court order to install or use the Tracking Tools.

230.    Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Blue Shield's violations of Cal. Penal Code § 638.51(a), and each seek statutory damages of $5,000 for each of Blue Shield's violations of Cal. Penal Code § 638.51(a).

**COUNT VI**
**Violation of the California Confidentiality of Medical Information Act ("CMIA"),**
**Cal. Civ. Code §§ 56, *et seq.***
**(On Behalf of Plaintiffs and the California Subclass)**

231.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

232.    The California Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56, *et seq.* ("CMIA") prohibits health care service plans from disclosing medical information relating to their patients without a patient's express authorization. Medical information refers to "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care… regarding a patient's medical history, mental or physical condition, or treatment. 'Individually Identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual." Cal. Civ. Code § 56.05.

233.    Defendant is a health care service plan as defined by Cal. Civ. Code § 56.05.

234.    Plaintiffs and Class Members are members of Blue Shield and, as a health care service plan, Blue Shield has an ongoing obligation to comply with the CMIA's requirements with respect to Plaintiffs' and Class Members' confidential medical information.

235.    As set forth above, Protected Information that can uniquely identify Plaintiffs and Class Members is transmitted to Google in combination with medical conditions, medical concerns, treatment(s) sought by the patients, and other patient searches and queries. This Protected Information constitutes confidential information under the CMIA.

236.    Pursuant to the CMIA, the information communicated to Blue Shield and disclosed to Google and other third parties constitute medical information because it is information derived from a health care service plan member regarding a patient's medical treatment and physical condition and is received in combination with individually identifying information. Cal. Civ. Code § 56.05(g) and 56.05(j).

237.    As set forth above, Google views, processes, and analyzes the confidential medical information it receives via Google Analytics. Google then uses the viewed confidential information for advertising and marketing purposes.

238.    Defendant failed to obtain Plaintiffs' and Class Members' authorization for the disclosure of medical information.

239.    Pursuant to Cal. Civ. Code § 56.11, a valid authorization for disclosure of medical information must: (1) be "clearly separate from any other language present on the same page and …

executed by a signature that serves no other purpose than to execute the authorization;" (2) be signed and dated by the patient or their representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. The information set forth on Blue Shield's Web Properties, including the website's Privacy Policy and Notice of Privacy Practices, does not qualify as a valid disclosure or authorization.

240.   Defendant violated the CMIA by disclosing its patients' medical information to Google along with the patients' individually identifying information.

241.   In violation of Cal. Civ. Code § 56.10(e), Defendant disclosed Plaintiffs' and Class Members' medical information to unauthorized persons.

242.   In violation of Cal. Civ. Code § 56.101(b)(1)(A), Defendant's electronic health record system or electronic medical record system failed to protect and preserve the integrity of electronic medical information.

243.   Defendant also violated Cal. Civ. Code § 56.36(b) by negligently releasing Plaintiffs' and Class Members' Protected Information.

244.   Plaintiffs and Class Members seek nominal damages, compensatory damages, punitive damages, attorneys' fees, and costs of litigation for Defendant's violations of the CMIA.

**COUNT VII**
**Violation of the Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of Plaintiffs and the California Subclass)**

245.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

246.   California's Unfair Competition Law ("UCL") prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

247.   Blue Shield engaged in unlawful business practices in connection with its disclosure of Plaintiffs' and Class Members' Protected Information to unauthorized third parties, including Google, in violation of the UCL.

248.    Blue Shield's acts, omissions, and conduct, as alleged herein, constitute "business practices" within the meaning of the UCL.

249.    Blue Shield violated the "unlawful" prong of the UCL by violating, *inter alia*, Plaintiffs' and Class Members' constitutional rights to privacy and state and federal privacy statutes, including CIPA, CMIA, and ECPA.

250.    Blue Shield's acts, omissions, and conduct also violate the "unfair" prong of the UCL because those acts, omissions, and conduct offend public policy (including the federal and state privacy statutes and state consumer protection statutes, such as the ECPA, CIPA, CMIA, and HIPAA) and constitute immoral, unethical, oppressive, and unscrupulous activities that caused substantial injury to Plaintiffs and Class Members.

251.    The harm caused by Blue Shield's conduct outweighs any potential benefits attributable to such conduct, and there were reasonably available alternatives to further Blue Shield's legitimate business interests other than Blue Shield's conduct described herein, such as not using the Tracking Tools.

252.    Plaintiffs and Class Members suffered from a loss of the benefit of their bargain with Blue Shield because they overpaid for insurance services they believed included data security sufficient to maintain their Protected Information as confidential.

253.    As a result of Blue Shield's violations of the UCL, Plaintiffs and Class Members are entitled to injunctive relief. This is particularly true since the dissemination of Plaintiffs and Class Members' information is ongoing.

254.    As a result of Blue Shield's violations of the UCL, Plaintiffs and Class Members have suffered injury in fact and lost money or property, including but not limited to payments to Blue Shield for services and/or other valuable consideration (e.g., access to their private and personal data).

255.    Plaintiffs and Class Members would not have used Blue Shield's services, or would have paid less for them, had they known Blue Shield was breaching confidentiality and disclosing their Protected Information to social media and tech giants such as Google.

256.    The unauthorized access to Plaintiffs' and Class Members' Protected Information has also diminished the value of that information.

257.    In the alternative to those claims seeking remedies at law, Plaintiffs and Class Members allege that there is no plain, adequate, and complete remedy that exists at law to address Blue Shield's unlawful and unfair business practices.

258.    Further, no private legal remedy exists under HIPAA. Therefore, Plaintiffs and Class Members are entitled to equitable relief to restore Plaintiffs and Class Members to the position they would have been in had Blue Shield not engaged in unfair competition, including an order enjoining Blue Shield's wrongful conduct, restitution, and disgorgement of all profits paid to Blue Shield as a result of its unlawful and unfair practices.

### COUNT VIII
### Invasion of Privacy Under California's Constitution,
### Cal. Const. Art. 1 § 1
### (On Behalf of Plaintiffs and the California Subclass)

259.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

260.    Plaintiffs and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their Protected Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites for the provision of insurance and health care without being subjected to wiretaps, pin registers, and/or trap and trace devices without their knowledge or consent.

261.    By using Google Analytics and accompanying Tracking Technologies to communicate patients' individually identifying information alongside their confidential medical communications and insurance information, Blue Shield intentionally invaded Plaintiffs' and Class Members' privacy rights under the California Constitution.

262.    Plaintiffs and Class Members had a reasonable expectation that their communications, identity, health information, and other data would remain confidential, and that Blue Shield would not install wiretaps, pin registers, and/or trap and trace devices to secretly transmit their communications and routing information.

263. Plaintiffs and Class Members did not authorize Blue Shield to transmit their Protected Information to third parties, nor did they consent to allowing third parties to intercept, receive, and view those communications.

264. This invasion of privacy is serious in nature, scope, and impact because it relates to patients' private medical communications. Moreover, it constitutes an egregious breach of the societal norms underlying the right of privacy.

265. As a result of Blue Shield's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

266. Plaintiffs and Class Members have been damaged as a direct and proximate result of Blue Shield's invasion of their privacy and are entitled to just compensation, including monetary damages.

267. Plaintiffs and Class Members seek appropriate relief for this injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests.

268. Plaintiffs and Class Members also seek punitive damages resulting from the malicious, willful, and intentional nature of Blue Shield's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights.

269. Such damages are needed to deter Blue Shield from engaging in such conduct in the future.

270. Plaintiffs also seek such other relief as the Court may deem just and proper.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grants the following:

    a) Certification of this action as a class action and appointment of Plaintiffs and Plaintiffs' counsel to represent the Class;

    b) A declaratory judgement that Defendant violated: (1) the Electronic Communications Privacy Act; (2) the California Invasion of Privacy Act; (3) the California Confidentiality of Medical Information Act; (4) the Unfair Competition Law; (5) Plaintiffs' and Class Members' privacy rights as provided at common law and pursuant

to the California Constitution; and (6) Plaintiffs' and Class Members' other rights under common law;

    c)    An order enjoining Blue Shield from engaging in the unlawful practices and illegal acts described herein; and

    d)    An order awarding Plaintiffs and the Class: (1) actual, statutory, and/or nominal damages; (2) punitive damages—as warranted—in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper; (5) reasonable attorneys' fees and expenses and costs of suit pursuant to Cal. Code of Civil Procedure § 1021.5 and/or other applicable law; (6) pre-judgment and post-judgment interest as provided by law; and (7) such other and further relief as the Court may deem appropriate.

## X.    JURY DEMAND

Plaintiffs demand a jury trial for all claims so triable.

Dated: April 29, 2025               Respectfully submitted,

                              By: */s/ Anne K. Davis*
                              Lesley E. Weaver (SBN 191305)
                              *lweaver@bfalaw.com*
                              Anne K. Davis (SBN 267909)
                              *adavis@bfalaw.com*
                              Joshua D. Samra (SBN 313050)
                              *jsamra@bfalaw.com*
                              **BLEICHMAR FONTI & AULD LLP**
                              1330 Broadway, Suite 630
                              Oakland, California 94612
                              Tel.: (415) 445-4003
                              Fax: (415) 445-4020

                              *Counsel for Plaintiffs and the Proposed Class*

CLASS ACTION COMPLAINT